**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | **Case No. 1:21-cr-00028-APM** |
| **v.** | ) | |
| | ) | |
| **BENNIE PARKER, and** | ) | |
| **CONNIE MEGGS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## REPLY IN SUPPORT OF DEFENDANTS BENNIE PARKER AND CONNIE MEGGS'S MOTION FOR JUDGMENT OF ACQUITTAL OR FOR NEW TRIAL

Despite ample opportunity to do so, the government wholly fails to persuade that as mere "foot soldiers" the defendants in this action are equally as culpable as those the government separately charged as leading the conspiracy alleged in *this* case. Indeed, despite not charging these defendants with seditious conspiracy, the government has now indicated it intends to seek terrorism enhancements as against these defendants.

### I.    *Bennie Parker*

As noted in his initial Rule 29 motion, Defendant Bennie Parker was convicted of Conspiracy to Obstruct an Official Proceeding, and Entering and Remaining on Restricted Building or Grounds. He was acquitted of Obstruction of an Official Proceeding, as well as Conspiracy to Prevent Members of Congress from Discharging their Duties.

Before the jury announced its verdicts against all of the defendants, it deliberated over the course of several days. When it delivered its first verdicts, it announced that it was deadlocked as to Mr. Parker's guilt on the conspiracy to obstruct the official proceeding count. The Court then instructed the jury to keep deliberating, and it was deadlocked for another 13 hours. Only after its initial days of deliberation, and an additional 13 hours of deliberation as to one count for Mr.

Parker and one count for Mr. Michael Greene, did it finally announce a guilty verdict as to Mr.

Parker.

But before the jury even announced that it had finally reached a verdict following the

Court's charge to the jury, defendant filed a written motion for a mistrial as the jury's

deliberations and deadlocked status had continued hour after hour, becoming, in defendant's

view, coercive.

The number of hours during which the jury was deadlocked clearly demonstrates its

doubt about the defendant's guilt on that charge, and it was only after it was instructed to keep

deliberating, with no idea whether it would ever be excused unless it forced a verdict, that it

returned a verdict of guilty on the conspiracy charge.  (It had already convicted the defendant of

the misdmeanor charge of Entering and Remaining.)

### A.  This is not a "Pro Forma" Motion for Judgment of Acquittal

This Court is well aware that in many, if not most, cases, defendants perfunctorily move

for a judgment of acquittal at appropriate times throughout a trial, often "on the record," rather

than after a clear and thorough explanation of why the facts, taken in the light most favorable to

the government, would not be sufficient to permit a reasonable juror to conclude, beyond a

reasonable doubt, that a defendant is guilty of a particular crime.

This is not one of those cases.

Defendant adamantly maintains that the facts brought out at trial do not establish that the

defendant conspired with others to obstruct the proceedings that had begun, and then been

interrupted, on January 6, 2021.  They also do not prove that Mr. Parker knew that where he was

standing, or had walked, was a restricted area at the time he gave an interview to a Swiss

reporter.

In his initial motion, Defendant Parker explained that the only argument the government could possibly make in support of the conspiracy to obstruct conviction is that Mr. Parker overheard the statement allegedly made by co-defendant Kelly Meggs before a group of people went into the Capitol that day, i.e., that the group was going to go into the Capitol and stop the vote count.

As noted, there was no proof that Mr. Parker overheard this statement, or that he was even present when it was uttered, given the "two-huddle" evidence.  Without such proof, the government cannot establish that the defendant conspired with the individuals who went into the Capitol with the corrupt purpose of obstructing the certification proceeding.

In its opposition to Bennie Parker's Rule 29 motion, the government contends that Mr. Parker's guilt was established because he was near Jessica Watkins when she received messages on the DC OP Jan 6 21 Signal group.  They further contend that he was with her when she "commanded her group to 'move' and they then collectively moved to the Capitol."

They add that Watkins provided updates on Zello as the group marched to the Capitol. The government's opposition quotes several statements Ms. Watkins made in the Zello chat group.

Mr. Parker, however, was not a part of the DC Op Jan 6 21 Signal group, and therefore did not receive their messages.  He also was not in the Zello chat group, and did not see its messages. Moreover, there is no evidence that Ms. Watkins relayed these messages to Mr. Parker, or that Mr. Parker understood any plan that Ms. Watkins and Mr. Meggs may have had at that point.

The government needs the Court to assume that Mr. Parker became aware of every message, or at least every critical, message Ms. Watkins received and sent in the two chat apps. Neither this Court, nor the jury, may do that.

The government states, on page 23 of its Omnibus opposition, that "Watkins, who recruited and traveled with Bennie Parker from Ohio, provided updates on Zello, a push-to-talk application, as they marched to the Capitol." But Mr. Parker did not have that app on his phone, and never received these messages. Moreover, as the video evidence introduced by the government, Mr. Parker was usually 20 or more feet behind Ms. Watkins as they walked.

Referencing this video, the government asserts that video and audio evidence from Ms. Watkins's phone proved that she was with Mr. Parker as they walked down Pennsylvania Avenue. (The government helpfully renders the walk sinister by characterizing it as a "march.")

Further in its opposition, but still on page 23, the government states that Mr. Parker "was still with Line One when the group reached the Capitol grounds and viewed rioters breaking the restrictive barriers." Even if this were true (regarding Mr. Parker's ability to see others breaking the restrictive barriers – and it is not clear which barriers the government is talking about, and where), the fact that he was still with Line One doesn't prove to any degree that he knew what that group planned to do.

It is clear that he knew that his wife wanted to go to the Capitol, as she thought she could help people inside who were hurt. But even then, he did not aid or abet her in doing so. He made a neutral statement toward her, telling her that it was up to her whether she wanted to go. Again, though, this does not show that he thought that she would be going in there to try to stop the vote count, or obstruct the proceeding. Many people who were there that day were there to

"have their voice heard," and weren't intending to act "corruptly" to interfere with the proceeding, even if their presence in the building had that unintended consequence.

The government next references Mr. Parker's interview with a Swiss reporter outside the East side of the Capitol.  But nothing in that interview shows, beyond a reasonable doubt, that Mr. Parker agreed with others to try to obstruct the proceedings, corruptly or otherwise.

Sadly, the government mischaracterizes Mr. Parker's statements to the reporter.  The government claims that "in his own words, he was aware of why rioters were forcibly entering the Capitol… and he agreed with those actions."  Gov. Opp. At 23.

Mr. Parker never once said, either on the witness stand or in that interview, that he knew why people were going into the Capitol.  He also never indicated any knowledge that those people were going into the Capitol to stop the election certification process.

He agreed that the conduct of the people who went into the Capitol was "not exactly" legal, but he didn't demonstrate any knowledge or assumption that it was illegal because of any supposed intent to stop the certification.  It was clearly illegal for people to push past police officers and go into the building, even if those people merely did so to "have their voices heard," as so many people have said was their intent.

The fact that Mr. Parker also told the Swiss reporter that there's "not exactly a whole lot they can do with this many people" and that "the Capitol belongs to us" does not indicate that he thought that the people who went inside were there to obstruct the proceedings, rather than to have their voices heard.  It would be rank speculation to conclude that his at-most ambiguous statement demonstrated any knowledge of a plan to interrupt the proceedings.

The government engaged in a leap of illogic in arguing that Mr. Parker's statement that "we just had a presidential election and it was stolen from us" somehow showed that he "tied"

the actions of the folks who went inside the Capitol to the certification proceedings taking place

inside.  Id.  Again, many people went inside the Capitol completely unaware of the certification

proceedings, or without any intent to obstruct those proceedings.  They went there to yell and

scream and have their voices heard (as government witness Caleb Berry himself admitted on the

stand).

Thus, it would have been improper for a jury to assume, or guess, that Mr. Parker's

statements proved beyond a reasonable doubt that he had conspired with anyone to obstruct the

proceedings.

As noted in his initial Rule 29 motion, in order for Mr. Parker to be guilty of conspiracy

to obstruct an official proceeding, the evidence would have had to show that Mr. Parker was

aware of the Oathkeepers' plan to stop the vote count.  If he never knew there was a plan, he

could not have joined it.

But the plan was only revealed to the other members of the group by Kelly Meggs once

they were at the huddle.  Thus, if the plan was only revealed at the second huddle, where Mr.

Parker clearly was not present, he could not have known of the plan, or joined it.

And there was no basis for the jury to conclude that the plan was revealed at the first

stopping point, where Mr. Parker was clearly present.  Even if the plan was revealed at the first

huddle, which Mr. Berry said was probably not the case, there was no evidence introduced at

trial that Mr. Parker heard of it.

The jury would have had to disregard Mr. Berry's testimony that he did not think the plan

was discussed at the first huddle, and conclude, through mere speculation, that it was discussed

at that first stop.

While a jury is certainly permitted to assess a witness's credibility, when the witness himself, as here, has no idea which of the two huddles produced the critical information, and actually testifies that the information was probably given at the second huddle, where Mr. Parker was not present, the jury would be merely guessing about the location of the big reveal – something it is not permitted to do.

The government, on page 24 of its opposition, states that the evidence "established that the conspiracy to obstruct the proceeding began before Kelly Meggs gave his command, and existed at least by the time when the group began marching toward the Capitol." Even if that is true, there is no evidence Mr. Parker was aware of that conspiracy, either at its alleged beginning, in the middle, or at the end. The government is merely lumping in Mr. Parker with the rest of the group – something it cannot do.

Because of this, the Court should grant Mr. Parker's motion for acquittal on the count of conspiracy to obstruct an official proceeding.

Defendant finally notes that there was also no convincing evidence that he knew that where he was standing – outside the Capitol, and down the steps – was a restricted area. Videos of the supposed group "huddle" taken on the lower West sidewalk show that about 20 or more feet behind the defendants there was fencing and signage showing that people should not go past that fence. Mr. Parker never did. By the time Mr. Parker went up the hill on the sidewalk – again, at least a number of minutes after the others went up the hill – there were no bike racks, fences, or other signs that indicated that the sidewalks and/or the plaza were restricted areas. Thus, there was no evidence that Mr. Parker was guilty of the charge of entering and remaining on restricted Capitol grounds.

This is further confirmed by Mr. Parker's statement that he agreed that it was "not exactly" legal for folks to go inside the Capitol.  He never indicated any belief that where he was standing was a restricted area, or that it was illegal for him to be there.  In fact, he had no idea he wasn't allowed to be where he was standing and talking to the reporter.

For that reason, this Court should dismiss the misdemeanor entering and remaining charge as well.

II.    *Connie Meggs*

In its Opposition, the government asserts that the evidence at trial established Mrs. Meggs's guilt to support her conviction.  However, a cursory review of the evidence and relevant case law, even when viewed in a light deferential to the government, clearly establishes that this is not the case for the four matters raised by Mrs. Meggs in her Rule 29 Motion.

A.   <u>The Evidence was not Sufficient to Establish Beyond a Reasonable Doubt that Connie Meggs Obstructed an Official Proceeding and Entered and Remained in a Restricted Building or Grounds</u>

The government heavily relies on a single text message from Mrs. Meggs to a best friend for the proposition that, "[Mrs. Meggs] texted that she went to the Capitol 'to stop the vote.'" Opp. at 33 (June 22, 2023) (ECF 950).  However, a review of the entire text message at issue (rather than the government's misleading snippet of the message), taken in accordance with Mrs. Meggs's testimony about the nature of the text message cited by the government, completely undermines any claim that this piece of evidence was sufficient to establish the requisite intent required to establish her intent beyond a reasonable doubt.  See Motion for Judgment of Acquittal, at 7 (May 29, 2023) (ECF 933) ("[Mrs. Meggs's] message [sent on January 6, 2021 at 11 PM] – 'everyone went to the capital [sic] to stop the vote and police attacked' – cannot reasonably be interpreted as evidencing her intent at the time she entered the Capitol.")  *See also*

*id.*, at 11-12 ("As evidence of Mrs. Meggs's knowledge of the alleged conspiracy, the government cites one private text message from Mrs. Meggs on the night of January 6, 2021, observing that 'everyone went to the Capitol to stop the vote.'  Nothing about the text, standing alone, suggests that Mrs. Meggs considered herself one of the 'trumpets' who sought to stop the certification." (internal citation omitted)).  Mrs. Meggs's testimony on the message in question was that the lone text message, "merely memorializes her observation of what happened that day as she and her husband were watching the news from their hotel room that night."  *Id.* at 12.  The Court should read the evidence in its entirety, rather than in the government's snippet, before considering the government's contention that the message is "explaining why [Mrs. Meggs] went to the Capitol, [and] is alone sufficient evidence upon which a jury could rely in determining that [Mrs. Meggs] intended to obstruct the proceeding." ECF 950, p. 33

The government once again overly complicates a straightforward issue: can Mrs. Meggs be guilty beyond a reasonable doubt of impeding or obstructing an official proceeding without proving the intent to achieve that outcome?  To reach that decision, the Court needs to recall that it has been called into question in this circuit whether binding Supreme Court precedent establishes that statutes which use the term "corruptly," including 18 U.S.C. § 1512(c)(2), are specific intent crimes, and whether the application of 18 U.S.C. § 1512(c)(2) needs to be narrowed to avoid potential issues of surplusage.  *See United States v. Fischer*, 64 F.4th 329, 374 (D.C. Cir. 2023) (Katsas, J., dissenting) ("[T]he solution is surely not to *broaden* the scope of Section 1512(c) to what the government suggests, and thereby significantly *increase* the degree of overlap or surplusage.  Instead, the solution would be to *narrow* the scope of section 1512(c)[.]" (emphasis in original)).  *See also* Department of Justice Criminal Resource Manual 1731, *Protection of Government Processes – State of Mind – 18 U.S.C. 1512* ("§ 1512(c) does

not require specific intent but specific results, for example, preventing a witness from testifying

at an official proceeding. However, this distinction is probably without a difference, and the

specific results should be read as forms of specific intent.").  Ultimately, the issue of intent goes

beyond the mere citation of a small portion of a text message taken without context, and besides

that lone point, the government has provided a dearth of evidence to establishes Mrs. Meggs's

intent.

     B.   <u>The Evidence was not Sufficient to Establish Beyond a Reasonable Doubt that
Connie Meggs Corruptly Obstructed an Official Proceeding</u>

The government contends that it has proved Mrs. Meggs acted corruptly, primarily by

arguing it did not need to prove that Mrs. Meggs acted with a purpose to obtain a lawful benefit.

However, recent case law should cast some doubt on whether the government's assertion is

actually accurate.  *See also United States v. Fischer*, 64 F.4th 329, 374 (D.C. Cir. 2023) (Katsas,

J., dissenting) ("As the concurrence explains, section 1512(c) requires the defendant to have

acted 'corruptly,' unlike the specific-intent crimes set forth in section 1512(a) and 1512(d). []

But the Supreme Court has explained that there is no 'meaningful difference' between acting

'corruptly' and acting with a 'specific intent' to obtain some unlawful advantage." (citing

*Marinello v. United States*, 138 S. Ct. 1101 (2018)).  In *Marinello v. United States*, the Supreme

Court when faced with the issue of whether an omnibus clause in 26 U.S.C. § 7212(a) which

made it a felony to "corruptly" or by force obstruct or impede the administration of the Internal

Revenue Code. *Marinello v. United States*, 138 S. Ct. 1101, 1104 (2018).  Ultimately, the

Supreme Court ruled that the statute was a specific intent crime, as are the many other statutes

which have a "corruptly" element, and that required the government to prove more than just

knowledge, but also a "purpose" or "objective" to obtain an unlawful benefit. *Id.* at 1114.  *See*

*also* 21 Am. Jur. 2d, Criminal Law §114 (2016) (noting a requirement to show both knowledge and purpose for crimes with a specific intent element).

The import of *Marinello's* ruling for the purposes of Mrs. Meggs is simple: the government has readily admitted that they did not prove knowledge of the certification *and* purpose or objective to delay the certification to prove Mrs. Meggs acted corruptly, as their position has been that the government need not prove the "unlawful benefit" element.  Opp. at 34 (June 22, 2023) (ECF 950) ("Although the concurrence would have determined that 'corruptly' means 'a criminal intent to produce an unlawful benefit' [this was] not adopted by other judges on the panel."); *id.* at 35-36 ("In total, there was overwhelming evidence from which a jury could conclude that Connie Meggs acted with 'unlawful means' and 'improper purpose,' and with 'consciousness of wrongdoing.'").  However, the assertion that the "unlawful benefit" element of the term "corruptly" is non-binding dicta seems in opposition to the Supreme Court's holding in *Marinello*, and the evidence does not prove the unlawful benefit element beyond a reasonable doubt.  As such, the evidence does not establish beyond a reasonable doubt that Mrs. Meggs acted corruptly.

**[SIGNATURE ON NEXT PAGE]**

Dated: July 14, 2023                    Respectfully submitted,

                                        _____/s/ Stanley E. Woodward, Jr._____
                                        Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
                                        BRAND WOODWARD LAW, LP
                                        400 Fifth Street Northwest, Suite 350
                                        Washington, DC  20001
                                        202-996-7447 (telephone)
                                        202-996-0113 (facsimile)
                                        Stanley@BrandWoodwardLaw.com

                                        *Counsel for Defendant Connie Meggs*

## CERTIFICATE OF SERVICE

On July 14, 2023, the undersigned hereby certifies that a true and correct copy of the

foregoing was electronically filed and served via the CM/ECF system, which will automatically

send electronic notification of such filing to all registered parties.

*/s/ Stanley E. Woodward, Jr.*

Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
BRAND WOODWARD LAW, LP
400 Fifth Street Northwest, Suite 350
Washington, DC  20001
202-996-7447 (telephone)
202-996-0113 (facsimile)
Stanley@BrandWoodwardLaw.com