UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No.: 21-CR-28-5 (APM) |
| | : | |
| BENNIE PARKER | : | |

**BENNIE PARKER'S INITIAL MEMORANDUM IN AID OF SENTENCING**

COMES NOW Defendant, Bennie Parker, through undersigned counsel, Stephen F. Brennwald, Brennwald & Robertson, and submits the following Memorandum in Aid of Sentencing. Defendant argues herein that under the unique circumstances of his case, a sentence of home confinement, followed by a period of supervised release and an order of restitution, would constitute a sentence that is sufficient, but not greater than necessary, to accomplish the goals enumerated in 18 U.S.C. § 3553(a).

*Background*

After a six-week trial, on March 16, 2023, Mr. Parker was found ***not guilty*** of Obstruction of an Official Proceeding and ***not guilty*** of Conspiracy to Prevent Officers of the United States from Discharging Their Duties, but guilty of the misdemeanor charge of Entering and Remaining on Capitol Grounds. The jury was deadlocked on the charge of Conspiracy to Obstruct an Official Proceeding.

After 13 hours of additional deliberation on this count alone (as well as on a count involving co-defendant Michael Greene), on March 21, 2023, the jury found Mr. Parker guilty on the conspiracy charge to obstruct an official proceeding charge (18 U.S.C. §

1512(k)).[1]

Prior to the jury's announcement, defendant had filed a motion for mistrial based on the fact that the jury had already deliberated on the conspiracy charge before returning its initial verdicts on March 16, 2023, and had, as of the time of the filing of the mistrial motion, deliberated an additional 13 hours before reaching a verdict. That substantial period of time would, in itself, indicate that the jury was uncertain about the defendant's guilt or it wouldn't have had to talk for that many more hours about the issue to reach a decision.

On May 30, 2023, defendant filed a motion for judgment of acquittal that is still pending. The government opposed the motion, and defendant (in a joint filing with defendant Connie Meggs, filed by her counsel, ECF Doc. 994) filed his reply.

Defendant submits that Mr. Parker's new trial motion should be granted, such that there would be no need for sentencing at all.

### *Summary of Arguments*[2]

**1. Any Conceivable Participation in a Conspiracy Lasted Minutes**

**2. The Defendant, if Guilty, is Entitled to a Minimal Role Adjustment**

---

[1] How the jury reached its verdicts in general, but also including its verdicts about Mr. Parker, was the subject of a disastrous and embarrassing (for the juror who gave the interview) recorded interview by a juror who was a C-Span employee. This may be discussed in greater detail should defense counsel have the time to address this important issue sufficiently cogently by the deadline for the submission of Mr. Parker's memorandum.

[2] It has been difficult for counsel to craft the appropriate wording for many of these arguments as each argument would necessarily assume that Mr. Parker is guilty of illegal conduct when the evidence simply does not support such a conclusion. The foregoing arguments assume, literally for the sake of argument, that Mr. Parker conspired with anyone on January 6, 2021, to obstruct an official proceeding.

   3. **The Eight-Level Enhancement Under 2J1.2(b)(1)(A) Does Not Apply to Mr. Parker**

   4. **The Three-Level Enhancement Under 2J1.2(b)(2) is Inappropriate**

   5. **The Two-Level Enhancement Under 2J1.2(b)(3) Does Not Apply To Mr. Parker**

   6. **The Two-Level Enhancement for Obstruction of Justice Does Not Apply**

   7. **The Terrorism Enhancement Does Not Apply to Mr. Parker**

   8. **The Terrorism Enhancement Does Not Apply to Mr. Parker**

   9. **Mr. Parker Is in Extremely Poor Health**

   10. **Mr. Parker Needs the Assistance of his Wife to Care for Him.**

*Argument*

   1. **Any Conceivable Participation in a Conspiracy Lasted Minutes**

Any conceivable participation by Mr. Parker in a conspiracy could have lasted only minutes, assuming for the sake of argument that he was ever a part of any conspiracy. Of course, defendant denies having even known of any conspiracy among the people he knew to obstruct the official proceeding taking place in the Capitol on January 6, 2021. The only people he knew (loosely speaking) other than his wife were co-defendant Jessica Watkins and co-defendant Donovan Crowl. And he hardly knew Ms. Watkins, and he knew Mr. Crowl even less.

He did not know Connie Meggs, Laura Steele, William Isaacs, or Michael Greene at all, and he certainly did not know Kelly Meggs. Yet Kelly Meggs is supposedly the

3

person who announced to "a" group[3] (there were two groups or "huddles" according to government witness Caleb Berry, and there was no clear testimony about who was in each group) that the group was going to go up the hill (on the North side of the Capitol) and try to stop the vote count.

While the government misleadingly claims that the Parkers (Bennie, and his wife Sandra) "first connected with the Oath Keepers on November 7[, 2020] at a rally protesting the outcome of the 2020 election, where they met Watkins," the truth is that when Ms. Watkins and Mr. Parker met on November 7, 2020, he said that Ms. Watkins told him that she was part of the Ohio State Regular Militia, "or something like that."

He added that later on, when he and Mrs. Parker told her that they were worried about their safety while in Washington, D.C., Ms. Watkins told them that she was part of the Oath Keepers too.  When they looked up the Oath Keepers online, "…it said that they were retired police and military, EMT, people like that, and we figured how can you not feel safe around people like that…?"

Neither Mr. Parker nor Mrs. Parker were included in any pre-January 6 chat groups where people discussed an insurrection or a plan to interfere with Congress.  They

---

[3] There is no evidence that Mr. Parker was in whichever group, or "mix of people" present, when Kelly Meggs allegedly made the statement that the group was going to go inside the Capitol, help two members who had become separated from the group, and interfere with the counting of the votes.  The only witness to describe this scene and those alleged words was co-defendant, Caleb Berry.  He testified as part of a cooperation agreement, hoping to receive a lesser sentence.  He testified that there were two occasions during which various members of the larger group "huddled."  And he said that at *one of those two huddles*, Kelly Meggs informed the group that they were going to go into the Capitol to try to stop the vote counting.  Mr. Berry could not say that Mr. Parker was a part of the group that heard these alleged words, so there is literally no evidence, other than that created by assumptions or suppositions, that Mr. Parker even heard these words, if they were ever uttered.  Mr. Parker testified that he did not hear Mr. Meggs say anything about that alleged plan.

came to the city to hear the former president speak, and that was it, so any claim that they came to the city as part of any Oath Keeper group is completely false.

After various speeches at the Ellipse, and when everyone said they were going to head to the Capitol to hear more speeches, Mr. and Mrs. Parker loosely walked with the group. Mr. Parker could not walk as fast as the others, and fell behind.

At some point, when the larger group had reached the lower Northwest area of the sidewalk leading up to the Capitol's East side, there was apparently a huddle, and then there was a second huddle toward the top of that sidewalk, perhaps even near the East steps. It's not clear during which huddle Mr. Meggs – *assuming arguendo* that he made such a statement – said that they group was going to go into the Capitol and stop the vote count.

Thus, again *assuming arguendo* that the huddle where Kelly Meggs allegedly discussed going into the Capitol to stop the vote count took place at the bottom of the sidewalk on the Northwest side, and further *assuming arguendo* that Mr. Parker somehow decided to join that effort in some way (how is not exactly clear), his participation in the conspiracy would have lasted from the time he decided to walk up the sidewalk toward the East side (as he did not walk with the group led by Kelly Meggs) until the time he decided to leave the area near the bottom of the steps. And while he was there, in the East plaza, he stood around talking to people, and gave a brief one-minute and thirty second interview to a Swiss-Italian reporter. He did not try to go up the stairs, encourage

anyone else to go up or in, or do anything other than stand in an area that appeared, by that point, to be open to the public.[4]

This in itself demonstrates the illogic of any conclusion that Mr. Parker had agreed to enter into any such conspiracy. While Mr. Parker believed that the election was stolen, he never posted anything online before or after January 6, 2021, indicating any plan or desire to go to the Capitol to interfere with the vote count, and he never did go into the Capitol.

He also testified at trial that he did not know what was going on inside the Capitol at that time. He explained that he doesn't "follow that stuff a lot, so [he] didn't even know they were going – they were in there to – for a vote or what they were doing." Sometimes that type of statement sounds less than credible given our knowledge today, but one must remember that the vast majority of people learned a great deal about the election process *after* the events of January 6, not before.

In any event, if Mr. Parker ever did agree to conspire with anyone to obstruct an official proceeding, he would have become aware of the conspiracy at the very last minute, and would have had to make a rapid decision to join it by walking up the sidewalk and standing outside the East steps while the others went inside.

For literally that conduct, and that conduct alone, the probation office has

---

[4] It is noteworthy that the reporter with whom Mr. Parker spoke never even insinuated that the area where they were standing was closed to the public. Rather, he asked Mr. Parker about the legality of the actions of the people who went up the stairs and into the Capitol. That implies that neither Mr. Parker nor the reporter even considered that the plaza where they were standing was closed to the public.

recommended a sentence of 5 years in jail. The government has recommended "a significant sentence."

There is no doubt that when Mr. Parker was in the East plaza, he expressed his belief to a reporter that he believed that the election was stolen. He also stated that he did not think that what the people who went inside the Capitol were doing was "legal," as he saw chaos on the steps, and many police officers at the top of the steps apparently struggling with "protestors."

The ambiguity of the statement about the illegality of the conduct of those who went inside demonstrates that it is impossible to determine from that statement whether Mr. Parker ever joined any conspiracy to obstruct, as many people went inside not to stop the count but to yell and scream and protest.

The government points to the splitting up of the group of people who went inside with Kelly Meggs, one smaller group going towards the House, and the other going towards the Senate. Mr. Parker, obviously, did not see anyone do anything once they went inside the building so he would have had no way of knowing whether they went in there to protest, to help others (as his wife Sandra did, in his mind), or to try to stop the vote count. Even if he'd heard what Kelly Meggs had allegedly said during one of the huddles, and approved of that thought internally, nothing that Mr. Parker did evinced a desire and willingness to join a conspiracy to obstruct the proceedings that day.

Again, however, assuming that he somehow demonstrated an intent to join a

conspiracy to obstruct the vote count, it would have only begun at the lower end of the sidewalk on the north side of the Capitol (if, again that was the "huddle" where Mr. Meggs allegedly made his vote-count statement) and it would have ended when he left the plaza to try to go find his wife.

That conduct does not merit any time in jail. At all.

**2. Defendant, if Guilty, is Entitled to a Minimal Role Adjustment**

The government concedes in its memorandum that the defendants in Oath Keepers 3 are entitled to a two-level reduction because of their "minor" role in the offense.

Defendant maintains that under the particular circumstances of his case, he is entitled to a four-level reduction as a minimal participant. U.S.S.G. § 3B1.2(a).

This is evident when one considers that Mr. Parker's alleged participation in this conspiracy entailed walking up the sidewalk at the north end of the Capitol and standing on the east side plaza for a period of time, chatting with folks, and waiting for his wife to come out of the building.

If the conduct of those who went into the Capitol was minor, Mr. Parker's conduct was certainly minimal, as it consisted of walking up a sidewalk and standing around outside for a relatively brief period of time.

Application Note 4 states that "[u]nder this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." That correctly sums up

8

the extent of Mr. Parker's alleged participation in this crime.[5]

### 3. The Eight Level Enhancement Under 2J1.2(b)(1)(A) Does Not Apply to Mr. Parker

The government argues that this enhancement applies to each defendant, but in its memorandum explaining how the enhancement applies to each of them, it does not explain how it applies to Mr. Parker. That is because it does not.

Even assuming for the sake of argument that Mr. Parker somehow agreed to obstruct the official proceeding after supposedly hearing Mr. Meggs say that the group was going to go into the Capitol and try to stop the vote count, that message alone would not have informed him that the plan involved violence, rather than an effort to talk to Senators and members of Congress and persuade them not to vote in favor of certification.

U.S.S.G. § 2J1.2(b)(1)(B) states that "[i]f the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice, increase by 8 levels. A reading of the "Background" section that follows the application notes clearly demonstrates that Mr. Parker's conduct does not fit within this enhancement. The enhancement was intended to apply to very serious efforts or attempts to obstruct justice, including threats of force, stealing or altering court

---

[5] One must also remember that Jessica Watkins had told Mr. and Mrs. Parker that they would be escorting VIP's during their stay in Washington, and in fact, Mr. Parker and other did escort the mother of a scheduled speaker to the Capitol. Thus, the idea that the defendants' claims that they went to the Capitol to provide security is false is belied by the testimony of the government's own witnesses, including Caleb Berry.

records, using intimidation to influence testimony, and more.

Mr. Parker stood outside the Capitol on the east side plaza chatting with people. He never spoke to any member of Congress inside the Capitol, he never instructed anyone else to take any action to obstruct any proceeding, and he certainly never caused or threatened to cause property destruction or injury to others.

Thus, on its face, the enhancement does not apply to Mr. Parker (and, again, the government has not pointed to any piece of evidence that would draw Mr. Parker's conduct into the ambit of this enhancement.

### 4. The Three-Level Enhancement Under 2J1.2(b)(2) is Inappropriate

Defendant is aware of this Court's prior determination that this enhancement applies in January 6 cases, but raises this objection for the record. He relies on the opinion of a member of this Court in *United States v. Seefried*, 21-cr-287 (TNM), ECF Doc. 123.

### 5. The Two-Level Enhancement Under 2J1.2(b)(3) Does Not Apply To Mr. Parker

This enhancement clearly would apply to a number of defendants in the so-called Oath Keeper cases. Quite a few of the defendants did plan for this event rather extensively, some more than others. Mr. Parker, on the other hand, did not plan any criminal activity at all. He and his wife were duped by Jessica Watkins into joining them on the walk to the Capitol after the speeches at the Ellipse. The entire trip to Washington, D.C. resulted in part from Ms. Watkins' desire to impress others by bringing

as many people as possible to the rally, and pretending as if her "chapter" of the Oath Keepers was larger than it was.

Mr. Parker was never an Oath Keeper. He only came to the city to hear a speech. At best, it wasn't until Kelly Meggs said something about going into the Capitol to stop the vote count that Mr. Parker would have known that this was now the new plan (as opposed to going to the Capitol to hear more speeches, as was revealed at trial). And even then, that simple phrase would not have informed Mr. Parker about the scope and extent of Mr. Meggs' and Mr. Rhodes' plan.

Mr. Parker, like many others, viewed the people who went into the Capitol as protestors – people who could scream and yell and have their voices heard. There is no basis to believe that he thought or knew that anyone was going to go in (especially the supposedly "law and order Oath Keepers) to cause violence of any kind. He may have also speculated that they were going to meet with members of Congress or senators to impress upon them the need to object to the certification.

Whatever the case, this enhancement should not apply to a man who was duped into walking to the Capitol under the guise of being needed to provide security to VIP's, especially when that man did nothing to plan any activity at all.

**6. The Two-Level Enhancement for Obstruction of Justice Does Not Apply**

The government contends that this enhancement applies to Mr. Parker in two ways: First, it claims that it applies because after these events, he deleted his

communications with Jessica Watkins from his phone. Second, it claims that Mr. Parker was not completely truthful on the stand, weakly alleging that his claim that he brought his AR-15 to Virginia in the hope that he could go target shooting was false.

Neither basis for an enhancement applies.

First, Mr. Parker testified that he deleted his messages to Ms. Watkins after these events "[b]ecause after that, I just wanted nothing to do with any militia. And actually, I kind of felt like we were kind of duped into some of this, I think, to make – I think Jessica wanted to make her militia look a little bit bigger than two or three people."

That was the real reason he deleted his contacts with her, and that does not constitute an intentional effort to obstruct justice.

As to the second alleged basis for this enhancement, the government argues that Mr. Parker "provided false testimony about his reasons for bringing an AR-15 firearm to the D.C. area for January 6." "Specifically," the government asserts, "he claimed the weapon was only for target practice, but could not point to any evidence of plans or even a possible location for such activities."

The government misstates basic facts, as well as Mr. Parker's testimony.

First, Mr. Parker did not bring the gun to the "D.C. area." While metropolitan areas can be quite expansive, there is a limit to that expanse. Google Maps puts the distance between Winchester, Virginia, where the guns were left, and the White House, which was Mr. Parker's ultimate general destination, at 79.9 miles, a distance it estimates

would take an hour and 26 minutes by car when there is no traffic on the road.

Second, the government incorrectly states that Mr. Parker could not identify a location where he hoped to shoot the gun. That is simply not true. While Mr. Parker hadn't done research to find a particular gun store that may offer target shooting, he naturally (and correctly) inferred that Virginia's countryside would offer plenty of opportunities where one could fire a weapon.

However, when he arrived at the house where he and his wife (and Ms. Watkins and Mr. Crowl) were going to stay, it turned out to be "in … a subdivision." As a result, Mr. Parker said, "we just left the gun packed away."

That testimony, literally, was the only testimony the government pointed to in its attempt to argue that Mr. Parker was not truthful on the stand.

This Court, which certainly has a better memory than counsel, can likely recall the impression it had after Mr. Parker left the stand after his second and final day of testimony. That impression undoubtedly was that Mr. Parker was being candid, and expressed regret that he had ever come to Washington for what turned out to be a cataclysmic event in his life, as well as the life of his wife, Sandra Parker.

In any event, the Court should not apply this enhancement to Mr. Parker.

**7. The Terrorism Enhancement Does Not Apply to Mr. Parker**

It is no longer surprising, at this point in a review of the government's sentencing memorandum, that it would go so far as to claim that Mr. Parker should be hit with a

terrorism enhancement. It is a head-shaking allegation, but it is no longer surprising.

In support of its argument, the government points to Mr. Parker's words while on the east side plaza. Those words, as discussed earlier, included a claim that the 2020 election had been stolen. This was a belief that was, unfortunately, held by tens of millions of Americans. He also added, again as discussed earlier, that there was "not a whole lot that they can do with this many people."

The government clearly interprets these words in a self-serving way when, in fact, the words are at best ambiguous. But in the context of his entire statement, it is clear that Mr. Parker was referring not to any effort to stop the vote counting, but to the impossibility of stopping people from protesting and exercising their First Amendment rights.

Defendant is not arguing that people had the right to go into the Capitol to yell and scream that the election was stolen. That was clearly trespassing. But he was not referring to any vote count when he was saying that the police couldn't stop the people who had gone into the Capitol. This is further evidenced by the fact that Mr. Parker had no idea what people were doing in the Capitol itself, as he was never in the building.

Again, even if he had heard Mr. Meggs say that Meggs and some others were going to go into the Capitol to try to stop the vote count, that does not lead to the conclusion, given Mr. Parker's lack of knowledge of Mr. Meggs' and Mr. Rhodes' plan, that violence, rather than attempts at persuasion, would be called for or used.

14

We are all, understandably, looking at past events with the benefit of years of revelations about how the proceedings were supposed to unfold, and what occurred on all sides of the Capitol.  But like many others, Bennie Parker had an extremely limited base of knowledge about practically every aspect of the events of the day.

Finally, Mr. Parker's final statement on the video interview – that there may need to be a civil war in the future- clearly proves that the civil war, at least in his mind, was not going to take place that day, and certainly was not unfolding before his very eyes.  If he had thought otherwise, he would have said that "this is" a civil car, "we are taking care of this here and now."  But his statement, as unfortunate as are the thoughts it revealed, was a forward-looking statement, and no more.  For these reasons, no adjustment under U.S.S.G. § 3A1.4 should be applied.

**8. The Enhancement Under U.S.S.G. § 5K2.6 Does Not Apply**

Not surprisingly, given what we've seen already, the government argues that this enhancement should apply to Mr. Parker because he allegedly "left [his] home state[] with weapons [he] planned to contribute to the QRF."

The government literally has no evidence that this is true.  In fact, the evidence roundly contradicts this claim.  One need look no further than the fact that Mr. Parker left both his handgun and the AR-15 in Winchester on his way to Washington, D.C.  Thus, it is not as if Mr. Parker brought the gun to Arlington or whichever city where the defendants stayed during their time here and then decided to take it back out to

15

Winchester. He never brought it to the location of the QRF, and in fact, he didn't even know what the acronym QRF meant when Ms. Watkins mentioned that there would be one.[6]

It is troubling that the government would advance this argument, given the clear and undisputed facts of this case, but "here we are."

**Final Sentencing Computation:**

Defendant calculates his final sentencing numbers as follows:

| | |
|---|---|
| Base Offense Level | 14 |
| Increase under 2J1.2(b)(2)[7] | 3 |
| Minimal Role Adjustment | - 4 |
| Final Total | 13 |
| Criminal History Category I | |
| Guideline Range:  12-18 months. | |

*Analysis of Sentencing Factors*

As this Court knows, pursuant to *United States v. Booker*, 543 U.S. 220 (2005) and *Gall v. United States*, 128 S.Ct. 586, 596-97 (2007), not only are the United States Sentencing Guidelines no longer mandatory, they are not even presumptively reasonable. In determining an appropriate sentence, this Court must consider the factors delineated in

---

[6] He testified that, as the text message thread with Mr. Watkins revealed, he never answered Ms. Watkins' text about the QRF because he was embarrassed that he didn't know what the acronym meant.
[7] Defendant assumes the Court will impose this enhancement.

18 U.S.C. § 3553(a), and impose a sentence that:

1) reflects the seriousness of the crime;

2) promotes respect for the law;

3) provides just punishment;

4) deters criminal conduct;

5) protects the public from further crimes, and

6) provides the Defendant with any necessary educational or vocational training, medical care, or other correctional treatment.

In addition, this Court must also consider

1) the nature and circumstances of the offense;

2) the history and characteristics of the defendant;

3) the kinds of sentences available;

4) the sentencing range;

5) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and

6) the need to provide restitution to any victims of the offense.

***Disputes as to a Sentencing Guideline Enhancement***

***Analysis of 3553(a) Factors***

17

***The Proposed Sentence Would Reflect the Seriousness of the Crime***

To be Supplemented.

***The Proposed Sentence Must Also Promote Respect for the Law, Provide Just Punishment to Mr. Sibick, and Deter Criminal Conduct, both by him and by Others.***

To be Supplemented.

***The Need to Protect the Public from Further Crimes.***

To be Supplemented.

***The Court's Duty to Provide the Defendant with any Necessary Educational or Vocational Training, Medical Care, or Other Correctional Treatment.***

To be Supplemented.

***The Need to Avoid Unwarranted Disparities***

To be Supplemented.

***Conclusion***

To be Supplemented.

       Respectfully submitted,

        /s/

       _____
       Stephen F. Brennwald, Esq.
       Bar No. 398319
       Brennwald & Robertson, LLP
       922 Pennsylvania Avenue, S.E.
       Washington, D.C.  20003
       (301) 928-7727
       (202) 544-7626 (facsimile)
       E-mail:  sfbrennwald@cs.com


<u>CERTIFICATE OF SERVICE</u>

  I HEREBY CERTIFY that a copy of the foregoing was sent by email, this 21st day of August, 2023, to all counsel of record.


        /s/

       _____
       Stephen F. Brennwald

19